**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

Nos. 22-1214 and 22-1315

————

FOOD & WATER WATCH,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————

Matthew R. Christiansen
 General Counsel

Robert H. Solomon
 Solicitor

Scott Ray Ediger
 Attorney

For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

INITIAL BRIEF: May 15, 2023

## Certificate as to Parties, Rulings, and Related Cases

**A.    Parties:**

The parties appearing before this Court and before the Federal

Energy Regulatory Commission are as stated in petitioner's brief.

**B.    Rulings under review:**

1.    *Tennessee Gas Pipeline Co.,* Order Issuing Certificate, 179
      FERC ¶ 61,041 (2022) (Certificate Order), R. 395, JA ____;
      and

2.    *Tennessee Gas Pipeline Co.,* Order on Rehearing and
      Denying Stay, 181 FERC ¶ 61,051 (2022) (Rehearing Order),
      R. 414, JA ___.

**C.    Related cases:**

This case has not previously been before this Court or any other

court.

                                            */s/ Scott Ray Ediger*
                                            Scott Ray Ediger
                                            Attorney

May 15, 2023

# Table of Contents

Statement of Issues ....................................................................... 1

Statutes and Regulations ............................................................. 4

Statement of Facts ........................................................................ 4

I.      Statutory and regulatory background ............................. 4

      A.     Natural Gas Act ...................................................... 4

      B.     The Commission's Certificate Policy Statement ................... 5

      C.     National Environmental Policy Act ...................................... 7

III.    The Commission's review of the project ......................... 9

      A.     The East 300 Upgrade Project ................................. 9

      B.     Environmental review ........................................... 10

      C.     Challenged orders ................................................ 13

Summary of Argument .................................................................. 15

Argument ........................................................................................ 17

I.      Standard of review ............................................................. 17

II.     The record supports the Commission's Natural Gas Act finding of need .................................................................... 20

      A.     The contract fully subscribing to Project capacity, in addition to Consolidated Edison's explanations related to its ongoing service obligations, fully support the Commission's finding of need ............................ 22

i

# Table of Contents

B. The Commission considered the Climate Act and reasonably concluded that it did not undermine its need determination. .....................................................................25

C. Food & Water Watch failed to properly raise an argument with regard to New York City's prohibition of new gas connections; even if it had, that argument would be unavailing. ............................................................................28

III. The Commission complied with all environmental responsibilities under NEPA. .........................................................32

A. The Commission correctly determined that effects related to upstream natural gas production are not Project indirect effects under NEPA. ...............................................33

1. There is no causal link between the Commission's approval of the Project and increased natural gas production. ...................................................................35

2. Any upstream production effects from the Project are not reasonably foreseeable. ..........................................38

B. The Commission's evaluation of downstream indirect ozone effects fully complied with NEPA. ..............................45

C. The Commission's discussion of the significance of greenhouse gas emissions fully complied with NEPA. ........51

Conclusion ............................................................................60

# Table of Authorities

## COURT CASES:

*Ameren Servs. Co. v. FERC,*
    893 F.3d 786 (D.C. Cir. 2018)..........................................................28

*Appalachian Voices v. FERC*, No. 17-1271,
    2019 WL 847199 (D.C. Cir. Feb. 19, 2019) ...................................59

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ................................................................8, 19, 60

*Birckhead v. FERC,*
    925 F.3d 510 (D.C. Cir. 2019).......................... 35, 36, 37, 38, 41, 43

*City of Nephi, Utah v. FERC,*
    147 F.3d 929 (D.C. Cir. 1998).........................................................36

*Coal. for Responsible Growth v. FERC,*
    485 F. App'x. 472 (2d Cir. 2012)....................................................34

*Coal. on Sensible Transp., Inc. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987) ..........................................................48

*Columbia Gas Transmission Corp. v. FERC,*
    750 F.2d 105 (D.C. Cir. 1984).........................................................18

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ........................................................................20

*Del. Riverkeeper Network v. FERC,*
    45 F.4th 104 (D.C. Cir. 2022) (*Adelphia*).. 19, 22, 33, 34, 35, 38, 39,
    44, 45, 49, 50

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ...................................................................8, 34

# Table of Authorities

*EarthReports, Inc. v. FERC,*
    828 F.3d 949 (D.C. Cir. 2016)...................................................35, 59

*Env't Health Tr. v. FCC,*
    9 F.4th 893 (D.C. Cir. 2021) ............................................................52

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ...................................................................18

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) .......................................................................17

*Fla. Gas Transm. Co. v. FERC,*
    604 F.3d 636 (D. C. Cir. 2010).......................................................20

*Food & Water Watch v. FERC,*
    28 F.4th 277 (D.C. Cir. 2022) ........................... 19, 43, 49, 51, 53, 54

*FPC v. Transcon. Gas Pipe Line Corp.,*
    365 U.S. 1 (1961) ...........................................................................18

*Friends of the River v. FERC,*
    720 F.2d 93 (D.C. Cir. 1983) ..........................................................46

*Indep. Power Producers of N.Y., Inc. v. FERC,* No. 21-1166,
    2022 WL 3210362 (D.C. Cir. Aug. 9, 2022)...................................26

*INEOS USA LLC v. FERC,*
    940 F.3d 1326 (D.C. Cir. 2019).......................................................36

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) .......................................................................19

*Metro. Edison Co. v. People Against Nuclear Energy,*
    460 U.S. 766 (1983) .......................................................................34

# Table of Authorities

*Minisink Residents for Env't Pres. & Safety v. FERC,*
    762 F.3d 97 (D.C. Cir. 2014) ......................................... 6, 18, 19, 23

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015)................................. 6, 11, 18, 22, 53

*N. Plains Res. Council v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011) ....................................................... 35

*N. Slope Borough v. Andrus,*
    642 F.2d 589 (D.C. Cir. 1980)....................................................... 20

*NAACP v. FPC,*
    425 U.S. 662 (1976) ........................................................................ 4

*Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n,*
    879 F.3d 1202 (D.C. Cir. 2018........................................................ 46

*Nat. Res. Def. Council, Inc. v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988)....................................................... 20

*Nat'l Comm. for the New River, Inc. v. FERC,*
    373 F.3d 1323 (D.C. Cir. 2004)...................................................... 19

*Pub. Utils. Comm'n of Cal. v. FERC,*
    900 F.2d 269 (D.C. Cir. 1990)......................................................... 4

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ........................................................................ 7

*S.C. Pub. Serv. Auth. v. FERC,*
    762 F.3d 41 (D.C. Cir. 2014) ....................................................... 20

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,*
    481 F.2d 1079 (D.C. Cir. 1973....................................................... 41

# Table of Authorities

*Sierra Club v. Dep't of Energy,*
  867 F.3d 189 (D.C. Cir. 2017).................................. 35, 41, 44, 46, 48

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*) .... 7, 19, 22, 32, 49, 60

*Sierra Club v. Marsh,*
  976 F.2d 763 (1st Cir. 1992)........................................... 35

*United Power, Inc. v. FERC,*
  49 F.4th 554 (D.C. Cir. 2022) ....................................... 28

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2013)................................ 32, 48, 49, 50, 60

## ADMINISTRATIVE CASES:

*Adelphia Gateway, LLC,*
  169 FERC ¶ 61,220 (2019) .................................... 34, 38, 39

*Adelphia Gateway, LLC,*
  171 FERC ¶ 61,049 (2019) ........................................ 34, 38

*Annova LNG Common Infrastructure, LLC,*
  170 FERC ¶ 61,140 (2020) ............................................ 46

*Baltimore Gas & Elec. Co.,*
  91 FERC ¶ 61,270 (2000) ............................................. 29

*Cent. New York Oil & Gas Co., LLC,*
  137 FERC ¶ 61,121 (2011) ........................................ 33, 37

*Cent. New York Oil & Gas Co., LLC,*
  138 FERC ¶ 61,104 (2011) ........................................ 33, 39

# Table of Authorities

*Certification of New Interstate Gas Pipeline Facilities,*
  88 FERC ¶ 61,227 (1999), *clarified,*
  90 FERC ¶ 61,128 (2000), *further clarified,*
  92 FERC ¶ 61,094 ...............................................................5, 6, 7

*Consideration of Greenhouse Gas Emissions in Nat. Gas*
  *Infrastructure Project Reviews,* Interim Policy Statement,
  178 FERC ¶ 61,108 (2022) ............................................................54

*Consideration of Greenhouse Gas Emissions in Nat. Gas*
  *Infrastructure Project Reviews,* Order on Draft Policy
  Statements,
  178 FERC ¶ 61,197 (2022) ............................................................54

*Fla. Se. Connection, LLC,*
  162 FERC ¶ 61,233 (2018) ..............................................................6

*Fla. Se. Connection, LLC,*
  164 FERC ¶ 61,099 (2018) ..............................................................7

*Mountain Valley Pipeline, LLC,*
  161 FERC ¶ 61,043 (2017) ............................................................59

*Mountain Valley Pipeline, LLC,*
  163 FERC ¶ 61,197 (2017) ............................................................59

*Nw. Pipeline, LLC,*
  157 FERC ¶ 61,093 (2016) ............................................................29

*PJM Interconnection, L.L.C.,*
  126 FERC ¶ 61,030 (2009) ............................................................30

*Tennessee Gas Pipeline Co.,*
  131 FERC ¶ 61,140 (2010) ......................................................40, 41

*Transcon. Gas Pipe Line Co.,*
  161 FERC ¶ 61,250 (2017) ............................................................29

# Table of Authorities

**STATUTES:**

**Administrative Procedure Act**

5 U.S.C. § 706 ..................................................................................... 17

**National Environmental Policy Act**

42 U.S.C. § 4332 ........................................................................... 32, 52

**Natural Gas Act**

15 U.S.C. § 717 ...................................................................................... 4

15 U.S.C. § 717f ........................................................................ 1, 3, 4, 5, 18

15 U.S.C. § 717r ....................................................................... 20, 33, 51

**REGULATIONS:**

18 C.F.R. § 385.713 ....................................................................... 28, 29

40 C.F.R. § 1501.3 .......................................................................... 8, 53

40 C.F.R. § 1502.16 ....................................................................... 34, 52

40 C.F.R. § 1502.3 ............................................................................... 52

40 C.F.R. § 1508.1 .......................................................................... 9, 34

**OTHER AURHORITIES:**

Climate Leadership and Community Protection Act,
    N.Y. Sess. Laws ch. 106 (McKinney) ............................................ 25

# Table of Authorities

*National Environmental Policy Act Implementing Regulations Revisions,*
    87 Fed. Reg. 23,453 (Apr. 20, 2022) ..................................................9

*Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act,*
    85 Fed. Reg. 43,304 (July 16, 2020) ..................................................9

# Glossary

| | |
|---|---|
| Br. | Opening brief of Petitioner Food & Water Watch |
| Climate Act | Climate Leadership and Community Protection Act, N.Y. Sess. Laws ch. 106 (McKinney) |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| Consolidated Edison | Intervenor Consolidated Edison Company of New York, Inc. |
| Environmental Assessment | Environmental Assessment, issued February 19, 2021, R. 49, and attached as Appendix C to Final EIS, JA ____ |
| Final EIS | Final Environmental Impact Statement, issued September 24, 2021, R. 379, JA ____ |
| Food & Water Watch | Petitioner Food & Water Watch |
| JA | Joint Appendix |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* |
| New York Commission | New York State Public Service Commission |
| Orders on review | |
| Certificate Order | *Tennessee Gas Pipeline Co.,* 179 FERC ¶ 61,041 (2022), R. 395, JA ____ |
| Rehearing Order | *Tennessee Gas Pipeline Co.,* 181 FERC ¶ 61,051 (2022), R. 414, JA ____ |

x

# Glossary

| | |
|---|---|
| P | Paragraph in a FERC order |
| Project | Tennessee Gas's East 300 Upgrade Project |
| R. | Record Item |
| Tennessee Gas | Intervenor Tennessee Gas Pipeline Company, L.L.C. |

# In the United States Court of Appeals
# for the District of Columbia Circuit

Nos. 22-1214 and 22-1315

————

FOOD & WATER WATCH,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————

## Statement of Issues

The Federal Energy Regulatory Commission (FERC or

Commission) issued a certificate of "public convenience and necessity,"

under section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), to

Intervenor Tennessee Gas Pipeline Company, L.L.C. (Tennessee Gas).

That certificate conditionally authorized Tennessee Gas, which owns

and operates interstate natural gas pipelines, to construct and operate

the East 300 Upgrade Project (Project), which includes construction and

operation of one new compressor station in Passaic County, New Jersey and modifications to two existing compressor stations, one in Susquehanna County, Pennsylvania and one in Sussex County, New Jersey.  The Project will permit Tennessee Gas to provide additional transportation service on its existing 300 Line to the sole, unaffiliated shipper on the Project, Intervenor Consolidated Edison Company of New York, Inc. (Consolidated Edison).  Consolidated Edison will use the additional capacity on Tennessee Gas's system to resolve supply constraints in Westchester County, New York.

In its Environmental Impact Statement (Final EIS), R. 379, the Commission determined that the Project's adverse environmental impacts would be reduced to less-than-significant levels by avoidance, minimization, and mitigation measures.  The Commission was unable to determine the significance of the Project's effect on climate change but provided and considered information about greenhouse gas emissions and climate change in its analysis.  Upon balancing the evidence of public benefits against the potential adverse economic and environmental effects of the Project, the Commission determined the Project would serve the public interest.  *See Tennessee Gas Pipeline Co.,*

Order Issuing Certificate, 179 FERC ¶ 61,041 (2022) (Certificate Order), R. 395, JA ____, Order on Rehearing and Denying Stay, 181 FERC ¶ 61,051 (2022) (Rehearing Order), R. 414, JA ____.

The issues on appeal, presented by Petitioner Food & Water Watch, are:

(1) Did the Commission adequately explain why, after weighing benefits and adverse effects, it found the Project to be consistent with the public interest under section 7 of the Natural Gas Act, 15 U.S.C. § 717f, even in light of state policies addressing climate change?

(2) Did the Commission reasonably comply with the National Environmental Policy Act (NEPA) when it: (a) found that indirect effects related to upstream natural gas production are neither caused by nor reasonably foreseeable effects of the Project, in light of Consolidated Edison's access to diverse supply regions; (b) found that indirect effects related to ozone are speculative and not reasonably foreseeable; and (c) quantified construction, operation, and downstream greenhouse gas emissions, compared them to national and state emissions, discussed the relationship between emissions and climate change, and provided the social cost of emissions?

3

## Statutes and Regulations

Pertinent statutes and regulations are reproduced in the Addendum.

## Statement of Facts

## I.      Statutory and regulatory background

### A.      Natural Gas Act

In the Natural Gas Act, Congress declared that the transportation and sale of natural gas in interstate commerce for ultimate distribution to the public is in the public interest.  *See* 15 U.S.C. § 717(a).  The Natural Gas Act is designed "to encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices."  *Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (quoting *NAACP v. FPC*, 425 U.S. 662, 670 (1976)).  To that end, section 1(b) grants the Commission jurisdiction over the transportation and wholesale sale of natural gas in interstate commerce.  15 U.S.C. § 717(b).

Before a company may construct and operate an interstate natural gas pipeline, it must obtain from the Commission a "certificate of public convenience and necessity" under section 7(c), 15 U.S.C. § 717f(c).

4

Under section 7(e), the Commission shall issue a certificate to any

qualified applicant upon finding that the proposed construction and

operation of the pipeline facility "is or will be required by the present or

future public convenience and necessity."  15 U.S.C. § 717f(e).  The Act

empowers the Commission to "attach to the issuance of the certificate

. . . such reasonable terms and conditions as the public convenience and

necessity may require."  *Id.*

### B.    The Commission's Certificate Policy Statement

In 1999, the Commission established its policy for certificating

new pipeline construction.  *See Certification of New Interstate Gas

Pipeline Facilities,* 88 FERC ¶ 61,227 (1999) (Certificate Policy

Statement), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC

¶ 61,094 (2000).  The Commission sought to balance anticipated growth

in demand for natural gas against concerns about overbuilding,

subsidization by existing captive customers, and unnecessary exercise

of eminent domain.  *Id.* at 61,736-37.

To achieve that balance, the Commission adopted a multi-step

analysis.  An existing pipeline faces a threshold question whether the

project can proceed without subsidies from its existing customers.  *See*

5

Certificate Policy Statement at 61,745; *Myersville Citizens for a Rural Cmty., Inc. v. FERC,* 783 F.3d 1301, 1309 (D.C. Cir. 2015).

Next, the Commission will consider adverse economic effects on the interests of the applicant's existing customers, competing existing pipelines and their captive customers, and landowners and surrounding communities. *See Certificate Policy Statement* at 61,747. After the pipeline applicant has made efforts to eliminate or minimize any adverse effects on these groups, the Commission balances any residual potential adverse effects against a project's public benefits. *See id.* at 61,745-46, 61,748-50; *Myersville,* 783 F.3d at 1309.

Public benefits may include "meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." *Certificate Policy Statement* at 61,748; *Minisink Residents for Env't Pres. & Safety v. FERC,* 762 F.3d 97, 101 n.1 (D.C. Cir. 2014). Most of these benefits "accrue from the proposed project itself, not from the end use of the transported natural gas." *Fla. Se. Connection, LLC*, 162 FERC ¶ 61,233 P 43, *reh'g denied,*

164 FERC ¶ 61,099 (2018) (on remand from *Sierra Club v. FERC*, 867
F.3d 1357, 1379 (D.C. Cir. 2017) (*Sabal Trail*)).

The balancing of public benefits against the adverse effects largely
focuses on economic interests such as those of existing customers, other
pipelines, and landowners. *See Certificate Policy Statement* at 61,745.
Only when the public benefits outweigh the adverse effects on economic
interests will the Commission complete its environmental analysis and
render a decision that considers both economic and environmental
issues. *See id.* at 61,745; *Fla. Se. Connection,* 164 FERC ¶ 61,099 P 54.

### C.    National Environmental Policy Act

The Commission's consideration of an application for a certificate
of public convenience and necessity triggers NEPA review. *See* 42
U.S.C. §§ 4321, *et seq.* NEPA sets out procedures to be followed by
federal agencies to ensure that the environmental effects of proposed
actions are "adequately identified and evaluated." *Robertson v. Methow
Valley Citizens Council*, 490 U.S. 332, 350 (1989). "NEPA imposes only
procedural requirements on federal agencies with a particular focus on
requiring agencies to undertake analyses of the environmental impact

7

of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).

"NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983) (citations and quotation marks omitted). Accordingly, an agency must "take a 'hard look' at the environmental consequences before taking a major action." *Id.*

Council on Environmental Quality implementing regulations require agencies to consider the environmental effects of a proposed action by preparing either an environmental assessment, if supported by a finding of no significant impact, or a more comprehensive environmental impact statement. *See* 40 C.F.R. § 1501.3(a)(2), (3).[1]

---

[1] The NEPA environmental documents in this case were issued pursuant to Council on Environmental Quality regulations issued in 1978. *See* Certificate Order P 32 n.55, P 49 n.89, JA ____, ____; Rehearing Order P 19 n.42, JA ____; Final EIS at 4 n.6, JA ____; Environmental Assessment at 1 n.2, JA ____. Revised regulations were issued in July 2020, and further revisions were issued in April 2022

NEPA requires consideration of direct effects ("caused by the action and occur at the same time and place") and indirect effects ("caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable").  40 C.F.R. § 1508.1(g)(1), (2).

## III.    The Commission's review of the project

### A.    The East 300 Upgrade Project

Tennessee Gas initiated administrative proceedings in June 2020 when it filed an application for authorization to construct and operate facilities at a new compressor station in Passaic County, New Jersey and at existing stations in Susquehanna County, Pennsylvania and Sussex County, New Jersey.  *See* Certificate Order P 1, 4-5 (describing proposed facilities), JA ____-__.  Tennessee Gas designed the Project so that it could provide additional firm transportation service on its

---

that generally restored provisions of the 1978 regulations that were modified in 2020.  *See Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act,* 85 Fed. Reg. 43,304 (July 16, 2020); *National Environmental Policy Act Implementing Regulations Revisions,* 87 Fed. Reg. 23,453 (Apr. 20, 2022).  Unless there is a substantive difference between versions relevant to this case, this brief will cite the current regulations as revised in 2022.

existing 300 Line system to a sole customer, the unaffiliated

Consolidated Edison.  *See id.* P 6, JA ____.

In support of the project, Tennessee Gas signed a 20-year binding

precedent agreement with Consolidated Edison, which was later

amended to provide for additional capacity.  *See* Certificate Order P 6,

JA ____.  Consolidated Edison, which provides natural gas service to

customers in New York City and Westchester County, and is regulated

by the Public Service Commission of New York (New York Commission),

actively participated in these agency proceedings to explain its need for

the additional natural gas transportation service on Tennessee Gas's

system.  *See id.*; Consolidated Edison July 13, 2020 Motion to Intervene,

R. 6, JA ____; *see also infra* Argument section II.A. (describing

Consolidated Edison's need for incremental service).

## B.    Environmental review

Commission staff issued an Environmental Assessment in

February 2021, and concluded that the project would not constitute a

major federal action significantly affecting the quality of human

environment, although it was unable to assess the significance of the

project's contribution to climate change.  *See* R. 49; *see also* Certificate

Order P 32 (describing Environmental Assessment), JA ____-__. After a comment period, the Commission issued notice that it intended to prepare a more comprehensive environmental impact statement. *See* Certificate Order P 33-35, JA ____-__; *see also Myersville,* 783 F.3d at 1322 (explaining that "[a]n agency may preliminarily prepare an Environmental Assessment ... to determine whether the more rigorous [Environmental Impact Statement] is required.").

The Commission staff issued the draft environmental impact statement in July 2021, R. 234, and the Final EIS in September 2021, receiving comments on both. *See* Certificate Order PP 33-35, JA ____-__. The Final EIS included the Environmental Assessment, in its entirety, as an appendix,[2] and included its analysis and conclusions, with the exception of analysis and conclusions related to the Project's impacts on climate change. *See id.* P 33, JA ____-__; Final EIS at ES-1 & n.2, JA ____. The Final EIS addressed geology, soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and endangered species, land use, recreation, visual resources, socioeconomics,

---

[2] Joint Appendix references herein to the Environmental Assessment will be to Appendix C, attached to the Final EIS.

11

environmental justice, cultural resources, air quality, noise, safety, cumulative impacts, and identified alternatives. *See* Certificate Order P 35, JA ____.

The Final EIS, which included disclosure of greenhouse gas emissions associated with the combustion of natural gas to be transported by the Project, was intended to assist the Commission in its consideration of the Project's contribution to climate change. *See* Final EIS at ES-1, 4 JA ____, ____. In particular, the Final EIS added an estimate of the downstream greenhouse gas emissions from the Project, assuming 100 percent utilization of the new capacity, to the analysis in the Environmental Assessment, which had quantified solely the Project's construction and operation emissions. *See* Final EIS at 16-17, JA ____-__. The Final EIS was unable to identify a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from these greenhouse gas emissions. *See* Final EIS at 17-18, 20, JA ____-__, ____. It concluded that construction and operation of the project will result in adverse environmental impacts, but that these impacts would be avoided or minimized through mitigation measures. *See id.* P 34, JA ____-__. Project impacts would not be significant except

12

for the Project's effect on climate change, the significance of which

staff was unable to determine.  *See id.*; Final EIS at ES-3, 55, JA ____,

____.

###  C.    Challenged orders

In April 2022, the Commission issued a certificate of public

convenience and necessity to Tennessee Gas.  *See* Certificate Order P 1,

JA ____.  All five Commissioners issued concurring statements.  *See id.*

p. 42, JA ____.  Food & Water Watch requested rehearing, R. 395, which

the Commission denied in October 2022.  *See* Rehearing Order P 1,

JA ____.  Three Commissioners concurred with separate statements.

*See id.* p. 25.  No Commissioner dissented in either order.

As relevant here, the Commission concluded that Tennessee Gas

demonstrated need for the project pursuant to the Natural Gas Act,

even after examining state policies setting targets for greenhouse gas

emissions reductions.  *See* Certificate Order PP 14-17, JA ____-__;

Rehearing Order PP 15-17, JA ____-__.  With regard to its

environmental review under NEPA, the Commission concluded that

upstream natural gas production is not an indirect effect within the

meaning of NEPA because those impacts are not legally caused

by the Project, and the Project's effects on natural gas production are
not reasonably foreseeable.  *See* Certificate Order PP 55-57, JA ____-__;
Rehearing Order P 27, JA ____-__.  The Commission considered and
analyzed downstream ozone, including ozone precursors and
ozone-related effects, but determined that formation of downstream
ozone is not an indirect effect within the meaning of NEPA
requiring quantification because localized ozone impacts
are not reasonably foreseeable.  *See* Rehearing Order PP 28-32, JA ____-
__.

Finally, the Commission quantified greenhouse gas emissions,
compared them to state and national emissions, and included a
qualitative discussion of the Project's contribution to climate change.
*See* Certificate Order PP 49-62, JA ____-__; Rehearing Order 33-37,
JA ____-__.  The Commission could not classify Project emissions as
significant or not significant.  *See* Certificate Order PP 54, JA ____-__;
Rehearing Order P 35, JA ____.  The Commission also estimated the
social cost of greenhouse gas emissions associated with the Project, but
did not rely on those estimates to determine environmental effects or

14

public interest.  *See* Certificate Order P 60, JA ____; Rehearing Order

P 36, JA ____.

## Summary of Argument

The Commission's approval of the Tennessee Gas Project fully

complied with the Natural Gas Act.  Consistent with Commission policy

and court precedent, the Commission properly found that the Project

was in the public interest and that there was need for the Project based

on Tennessee Gas's contract with unaffiliated Consolidated Edison for

all of the Project's capacity.  Food & Water Watch's attempts to

undercut these findings based on state and local policies fail because

Consolidated Edison demonstrated compelling, service-based reasons

for entering into the contract with Tennessee Gas.

The Commission's environmental analysis fully complied with its

responsibilities under the National Environmental Policy Act.  First,

the Commission reasonably determined that claimed indirect effects

related to upstream natural gas production are neither caused by the

Project nor are they reasonably foreseeable.  The Project will enable

Consolidated Edison to access diverse natural gas supplies from

expansive geographic locations across the country—including the

Marcellus, Utica, Gulf Coast, Appalachian, and Rockies supply areas—
to delivery points along Tennessee Gas's mainline 300 Line.  Food &
Water Watch is mistaken in presuming that natural gas supply for the
Project will come entirely from local (Marcellus or Utica) production, or
that Tennessee Gas can provide additional, meaningful information for
the purpose of upstream analysis.

Second, the Commission adequately evaluated downstream ozone-
related indirect effects.  As a reasonable proxy for ozone effects, the
Commission quantified emissions of ozone precursors (nitrogen oxides
and volatile organic compounds), discussed how those precursors are
involved in ozone formation, and discussed the health effects associated
with increased ozone.  The Commission is not legally obligated to take
the next, speculative step of quantifying the impacts of any increase in
ozone.

Finally, the Commission adequately addressed greenhouse gas
emissions.  The Commission (1) recognized that Project emissions would
contribute incrementally to climate change; (2) qualitatively discussed
climate change effects; (3) quantified Project greenhouse gas emissions,
including emissions from downstream end-use; (4) compared those

16

emissions to state and national emissions, including comparison to state goals; and (5) disclosed estimates of the social costs of those emissions. Under relevant caselaw, this analysis qualifies as a reasonable proxy for assessing incremental greenhouse gas emissions. Having fully disclosed and considered Project greenhouse gas emissions, in its environmental impact statement and in its orders, the Commission was not obligated to characterize Project emissions as significant or insignificant.

## Argument

## I. Standard of review

This Court reviews Commission actions under the Administrative Procedure Act's narrow "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). Under that standard, the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n,* 577 U.S. 260, 292 (2016). Rather, the reviewing court must uphold the Commission's determination "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice

made." *Id*. (cleaned up); *see also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("deferential" arbitrary-and-capricious standard requires only that agency action "be reasonable and reasonably explained").

Because the grant or denial of a Natural Gas Act section 7 certificate, 15 U.S.C. § 717f, is within the Commission's informed discretion, the Court does not substitute its judgment for that of the Commission. *See Myersville*, 783 F.3d at 1308; *see generally FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 7 (1961) (explaining that the Commission is "the guardian of the public interest," entrusted "with a wide range of discretionary authority"); *Columbia Gas Transmission Corp. v. FERC,* 750 F.2d 105, 112 (D.C. Cir. 1984) (explaining that the Commission is "vested with wide discretion to balance competing equities against the backdrop of the public interest"). The Commission has "broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines." *Minisink*, 762 F.3d at 111 (citation omitted). The Court evaluates only whether the Commission considered relevant factors and whether there was a clear error of

judgment. *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 108 (D.C. Cir. 2022) (*Adelphia*) (citing *Minisink*, 762 F.3d at 106).

The Administrative Procedure Act's arbitrary and capricious standard also applies to challenges to FERC certificate decisions under the National Environmental Policy Act. *See Del. Riverkeeper (Adelphia)*, 45 F.4th at 108; *Food & Water Watch v. FERC,* 28 F.4th 277, 285 (D.C. Cir. 2022); *Sierra Club (Sabal Trail),* 867 F.3d at 1367 (D.C. Cir. 2017). "[T]he court's role is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Nat'l Comm. for the New River, Inc. v. FERC,* 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quoting *Baltimore Gas & Elec.,* 462 U.S. at 97-98). Agency actions taken pursuant to NEPA are entitled to a high degree of deference. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377-78 (1989). This Court evaluates agency compliance with NEPA under a "rule of reason" standard and has consistently declined to "flyspeck" the Commission's analysis. *Minisink*, 762 F.3d at 112 (citations omitted). "[A]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference and a reviewing court

19

should not substitute its own policy judgment." *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980)).

The Commission's factual findings are conclusive if supported by substantial evidence. *See* 15 U.S.C. § 717r(b). The substantial evidence standard "'requires more than a scintilla' but 'less than a preponderance' of evidence." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (quoting *Fla. Gas Transm. Co. v. FERC*, 604 F.3d 636, 645 (D. C. Cir. 2010)). If the evidence is susceptible of more than one rational interpretation, the Court must uphold the agency's findings. *See Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966); *accord Fla. Gas Transm.,* 604 F.3d at 645 ("[W]e do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the Commission's ultimate decision.").

## II.   The record supports the Commission's Natural Gas Act finding of need.

Food & Water Watch challenges the Commission's Natural Gas Act determination of need for the Tennessee Gas Project. *See* Br. 48-56. It states the Commission ignored factors and erred by relying solely on Tennessee Gas's contract with Consolidated Edison. *See id.* 50. Food &

Water Watch argues that the Commission should have looked at other factors, i.e. state policies setting targets for greenhouse gas emissions reductions (*see id.* 50-54) and New York City's prohibition on natural gas connections for new and renovated buildings in New York City (*see id.* 54-56).

These arguments fail. First, consistent with Commission policy and court precedent, the Commission correctly determined need based on Tennessee Gas's contract with the unaffiliated Consolidated Edison for all of the capacity to be created by the Project. *See* Certificate Order P 17, JA ____-__; Rehearing Order P 17, JA ____-__. Second, in analysis largely ignored by Food & Water Watch, the Commission found that the record here demonstrates that Consolidated Edison had strong, service-based reasons for contracting for additional transportation service on Tennessee Gas's system. *See* Certificate Order P 6 (description of Consolidated Edison's filings), PP 14-17 (Commission's analysis), JA ____-__, ____-__. Finally, the state and local factors emphasized by Food & Water Watch are insufficient to call the Commission's analysis into doubt. *See id.* PP 14-17, JA ____-__; Rehearing Order PP 15-17, JA ____-__.

21

**A.    The contract fully subscribing to Project capacity, in addition to Consolidated Edison's explanations related to its ongoing service obligations, fully support the Commission's finding of need.**

The Commission evaluated the need component of Tennessee Gas's proposal under the Commission's Certificate Policy Statement. *See* Certificate Order PP 12-13, JA ____-__; *see also supra* pp. 5-7 (explaining Certificate Policy Statement).  Tennessee Gas's contract for all of the capacity on the Project with Consolidated Edison, especially in the absence of an affiliate relationship between the two contracting parties, was strong evidence of need.  *See* Certificate Order P 15 (citing Consolidated Edison August 5, 2020 Comments at 3, R. 18, JA ____), JA ____.  Precedent agreements showing that a project is fully (or substantially) subscribed are "adequate to support the finding of market need."  *Myersville*, 783 F.3d at 1311; *see also Del. Riverkeeper (Adelphia)*, 45 F.4th at 114 (explaining that the Commission is "not ordinarily required to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers") (quotations removed); *Sierra Club (Sabal Trail)*, 867 F.3d at 1379 (stating that an applicant can establish market need by presenting precedent agreements).  This Court has recognized that the

22

Commission's Certificate Policy Statement "specifically recognizes that [precedent agreements] 'always will be important evidence of demand for a project.'" *Minisink,* 762 F.3d at 111 n.10. And no court has reversed a Commission finding of need based on the subscription by unaffiliated entities to all of a proposed project's capacity. Accordingly, even if the Commission had relied solely on Consolidated Edison's contract with Tennessee Gas, the Commission's determination would have been based on substantial evidence; would have been consistent with the Certificate Policy Statement and this court's precedent; and would have been sufficient for this Court to affirm the Commission's finding of need.

In fact, evidence of need in this case goes well beyond the precedent agreement. Consolidated Edison explained that demand for natural gas has increased for various reasons in its service territory. *See* Certificate Order P 6 (citing Consolidated Edison August 5, 2020 Comments at 3-4, JA ____-__; and Consolidated Edison December 21, 2021 Answer at 4, 6, R. 386, JA ____, ____), JA ____-__. Although it has taken steps to address the increase in natural gas demand by implementing both demand- and supply-side controls, Consolidated

23

Edison has not been able to meet this increased demand.  *See id.* (citing Consolidated Edison August 5, 2020 Comments at 3-4, JA ____-__).

As a result of these challenges, Consolidated Edison has had to take unconventional steps to mitigate supply constraints.  For example, it adopted a temporary moratorium on connecting gas service for new customers in most of Westchester County, with the goal of continuing service to its existing customers on the coldest winter days.  *See* Certificate Order P 6 (citing Consolidated Edison August 5, 2020 Comments at 4, JA ____), JA ____.  In addition to these measures, Consolidated Edison arranged to truck compressed natural gas to its service area to meet peak winter demand.  *See id.* (citing Consolidated Edison December 21, 2021 Comments at 4, JA ____).

Given the various factors driving increased demand on Consolidated Edison's distribution system—revitalization projects, new construction, and conversion of other (higher emitting) fuel sources to natural gas—the Commission's determination of need is well-supported.  *See* Certificate Order P 6 (citing Consolidated Edison August 5, 2020 Comments at 3, JA ____), JA ____, P 17 (explaining that Consolidated Edison "has shown that natural gas demand in its service territories is

24

exceeding its available firm natural gas interstate pipeline capacity and that additional transportation capacity is needed to serve its existing and new customers"), JA ____.  The Project will allow Consolidated Edison to (1) lift the moratorium in Westchester County; (2) supply gas to new customers who request it; and (3) cease trucked deliveries of compressed natural gas.  *See id.* P 6 (citing Consolidated Edison August 5, 2020 Comments at 2-4, JA ____-__, ____; Consolidated Edison December 21, 2021 Comments at 4, 6, JA ____, ____; and Tennessee Gas August 23, 2021 Comments at 2-3, JA ____-__), JA ____.  All this is more than enough to demonstrate need for the Project.

## B.   The Commission considered the Climate Act and reasonably concluded that it did not undermine its need determination.

None of the above analysis of need is addressed, let alone challenged, by Food & Water Watch in its opening brief.  Rather, Food & Water Watch asserts that the Commission "failed to consider" the New York State Climate Leadership and Community Protection Act, N.Y. Sess. Laws ch. 106 (McKinney) (Climate Act).  *See* Br. 50-54.  The record demonstrates otherwise.  *See* Certificate Order P 17 (considering

implications of Climate Act on need determination), JA ____; Rehearing

Order PP 15-17 (same), JA ____-__.

The Climate Act sets targets for forward-looking reductions on

New York state greenhouse gas emissions and goals for electricity

generation from renewable energy sources. *See* Rehearing Order P 16

(citing N.Y. Pub. Serv. Law § 66-p), JA ____. But it "does not ban

[Consolidated Edison] from providing natural gas to meet end-use

demand." Certificate Order P 17, JA ____. Moreover, the Act does not

prescribe methods or means for achieving its targets and goals. *See*

Rehearing Order P 16, JA ____. Rather, a body created by the Act, the

Climate Action Council, "will develop a plan to assist New York with

meeting the goals of the Act, including potential alternative compliance

methods that would result in zero net emissions." *Id.* P 16 (citing N.Y.

Envtl. Conserv. Law § 75-0103); *see also Indep. Power Producers of*

*N.Y., Inc. v. FERC,* No. 21-1166, 2022 WL 3210362, at *1 (D.C. Cir.

Aug. 9, 2022) (unpublished) (explaining that the Climate Act requires,

among other things, that the New York Commission "introduce

regulations to ensure that, by 2040, the consumption of electricity

throughout the State will produce zero carbon emissions").

26

Even after considering the Climate Act, the Commission continued to find that the Project was needed, citing the fact that the new capacity is entirely subscribed by Consolidated Edison and that it will enable Consolidated Edison to supply new customers and end trucked compressed natural gas to satisfy peak winter demand. *See* Rehearing Order P 17, JA ____. As noted by the New York Commission, moratoria such as the one Consolidated Edison adopted in Westchester County can lead to customer hardships and can actually thwart climate change policy goals when use of alternatives to natural gas result in even more greenhouse gas emissions. *See* Certificate Order P 6 n.8 (citing Tennessee Gas August 23, 2021 Comments at 2-3, JA ____-__), JA ____. Moreover, as explained by Consolidated Edison, the Climate Act commitments "do not alter [Consolidated Edison's] obligation to serve those customers that request gas service." Consolidated Edison December 21, 2021 Comments at 8-9 (citing New York Commission orders and New York state statutory provisions), JA ____-__.

27

**C.    Food & Water Watch failed to properly raise an argument with regard to New York City's prohibition of new gas connections; even if it had, that argument would be unavailing.**

Food & Water Watch's citation to New York City's prohibition of new gas connections is unavailing, both procedurally and substantively. *See* Br. 54-56. First, the argument is procedurally barred because Food & Water Watch failed to list it in its statement of issues to its agency rehearing request. *See* 18 C.F.R. § 385.713(c)(2) (specifying that any issue not listed in the required Statement of Issues, where "each issue [is listed] in a separately enumerated paragraph," "will be deemed waived"); Food & Water Watch Rehearing Request at 3 (section containing list of issues but omitting any reference to New York City prohibition), R. 397, JA ____. Moreover, the brief reference to the New York City prohibition, hidden in a section of the rehearing request that addresses the Climate Act, fails to satisfy the strict exhaustion requirements of the Natural Gas Act, 15 U.S.C. § 717r(b). *See Ameren Servs. Co. v. FERC,* 893 F.3d 786, 793 (D.C. Cir. 2018) (petitioner must raise issues with sufficient specificity to "alert[] the Commission to the legal arguments they now raise on judicial review") (quotation omitted); *see also United Power, Inc. v. FERC,* 49 F.4th 554, 559 (D.C. Cir. 2022)

28

("Because we construe these statutory limitations upon our jurisdiction strictly, a single opaque sentence does not suffice, nor does raising a particular argument only in a general way.") (cleaned up).  Unlike Food & Water Watch's brief before this Court, where the Climate Act and the New York City prohibition are treated in separate, clearly labeled subsections (*see* Br. 50-56), Food & Water Watch referred below to the prohibition in a section that *solely* referred to the Climate Act (*see* Food & Water Watch Rehearing Request at 4-6, JA ____-__).

Second, the Commission "looks with disfavor" on parties raising new issues on rehearing.  *See Transcon. Gas Pipe Line Co.,* 161 FERC ¶ 61,250 P 58 (2017) (citing *Baltimore Gas & Elec. Co.,* 91 FERC ¶ 61,270, at 61,922 (2000)).  This is so because Commission rules (18 C.F.R. § 385.713(d)) do not permit responses to requests for agency rehearing.  *See Transcon. Gas*, 161 FERC ¶ 61,250 P 58; *see also, e.g., Nw. Pipeline, LLC,* 157 FERC ¶ 61,093 P 27 (2016) (dismissing argument raised for the first time on rehearing and noting that the "Commission looks with disfavor on parties raising issues for the first time on rehearing that should have been raised earlier, particularly during NEPA scoping, in part, because other parties are not permitted

to respond to requests for rehearing"); *PJM Interconnection, L.L.C.,* 126 FERC ¶ 61,030 P 15 & n.10 (2009) ("The Commission has held that raising issues for the first time on rehearing is disruptive to the administrative process and denies parties the opportunity to respond."). Food & Water Watch acknowledges that the New York City prohibition occurred before the Commission issued its Certificate Order. *See* Br. 54. It did not have to await agency rehearing.

Regardless, there are several flaws in Food & Water Watch's late argument. First, the prohibition applies to New York City. As discussed, the Project is designed to alleviate supply constraints, not in New York City (where the municipal prohibition exists), but in Westchester County (where the Consolidated Edison-adopted service moratorium exists). *See* Certificate Order P 6, JA ____. Food & Water Watch has failed to demonstrate that the New York City prohibition will affect supply constraints in Westchester County.

In addition, Consolidated Edison's retail rates and services are regulated by the New York Commission. *See* Consolidated Edison August 5, 2020 Comments at 1-2, JA ____-__. Here, the record evidence demonstrates that the New York Commission recognizes the harm that

can result from moratoria such as the one imposed in Westchester County.  *See* Tennessee Gas August 23, 2021 Comments at 2-3 (citing New York Commission Order Instituting Proceeding, No. 20-G-0131 (Mar. 19, 2020)[3] (New York Commission Order)), R. 369, JA ____-__; *see also* Certificate Order P 6 n.8 (citing Tennessee's August 23, 2021 Comments), JA ____.  Indeed, in the order cited by Tennessee Gas, the New York Commission recognized these hardships in a paragraph immediately following its discussion of the Climate Act.  *See* New York Commission Order at 2-3 (explaining that natural gas planning "must be conducted in a manner consistent" with the Climate Act and that "[m]oratoria can create adverse customer impacts").  Striking the right balance between hardship associated with supply constraints (ignored by Food & Water Watch) and consistency with goals set forth in the Climate Act (solely emphasized to the exclusion of everything else by Food & Water Watch) is a task appropriately addressed by the New York Commission, which has regulatory authority over Consolidated

---

[3] The New York Commission Order can be accessed at: https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={2BE6F1CE-5F37-4A1A-A2C0-C01740962B3C}

Edison. *See* Consolidated Edison August 5, 2020 Comments at 5 n.6

(explaining that "recent [New York Commission] actions regarding gas

moratoriums within New York reinforce our obligation to

provide customers energy service options, including natural gas"),

JA ____.

## III. The Commission complied with all environmental responsibilities under NEPA.

NEPA requires that agencies prepare, as part of every "major

Federal action [] significantly affecting the quality of the human

environment," a "detailed statement" discussing and disclosing the

environmental impact of the action. *Sierra Club (Sabal Trail),* 867 F.3d

at 1367 (quoting 42 U.S.C. § 4332(2)(C)). In reviewing an agency's

NEPA compliance, the Court's mandate is "simply to ensure that the

agency has adequately considered and disclosed the environmental

impact of its actions and that its decision is not arbitrary and

capricious." *Id.* (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298,

308 (D.C. Cir. 2013)).

### A.    The Commission correctly determined that effects related to upstream natural gas production are not Project indirect effects under NEPA.

Food & Water Watch asserts that the Commission failed to consider reasonably foreseeable indirect and cumulative upstream effects related to natural gas production.  *See* Br. 29-39.[4]  However, the Commission reasonably concluded that upstream natural gas production-related effects are not indirect effects of the Project as defined by NEPA, because effects related to natural gas production are generally neither caused by a proposed pipeline project nor the reasonably foreseeable consequences of a Commission-approved infrastructure project.  *See* Certificate Order PP 55-57 (citing *Cent. New York Oil & Gas Co., LLC,* 137 FERC ¶ 61,121 PP 81-101 (2011), *order on reh'g,* 138 FERC ¶ 61,104 PP 33-49 (2012), *petition for review*

---

[4] In its brief, Food & Water Watch sometimes refers to cumulative effects when addressing indirect effects.  *See*, e.g., Br. 26.  However, Food & Water Watch does not make any argument on review that is particular to cumulative, as opposed to indirect, effects.  And it omitted any reference to cumulative effects in its request for agency rehearing.  *See* Food & Water Watch Rehearing Request at 9-16 (addressing indirect effects), JA ____-__.  Therefore, Food & Water Watch has waived any argument based on cumulative effects alone.  *See* 15 U.S.C. § 717r((b); *see also, e.g., Del. Riverkeeper (Adelphia),* 45 F.4th at 111 (explaining that 15 U.S.C. § 717r requires specificity of argument).

33

*dismissed sub nom. Coal. for Responsible Growth v. FERC,* 485 F.

App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); and *Adelphia*

*Gateway, LLC*, 169 FERC ¶ 61,220 P 243 (2019), *order on reh'g,* 171

FERC ¶ 61,049 P 89 (2020), *aff'd Delaware Riverkeeper (Adelphia)*),

JA ____-__; Rehearing Order P 27 (same), JA ____-__.

Council on Environmental Quality regulations address

consideration of indirect effects.  *See* 40 C.F.R. § 1502.16

(environmental consequences); 40 C.F.R. § 1508.1(g)(1), (2) (defining

effects to include direct effects and indirect effects); *Dep't of Transp. v.*

*Pub. Citizen*, 541 U.S. 752 (2004); *Metro. Edison Co. v. People Against*

*Nuclear Energy,* 460 U.S. 766 (1983); *see also* Certificate Order P 56

(citing *Pub. Citizen* and *Metro. Edison*), JA ____; Rehearing Order P 26

(same), JA ____.  Indirect effects are "caused by the action and are later

in time or farther removed in distance, but are still reasonably

foreseeable."  40 C.F.R. § 1508.1(g)(2).  Causation requires a reasonably

close connection; a "but for" cause is insufficient.  *See Pub. Citizen,* 541

U.S. at 767.  The effect cannot be too attenuated; if the agency has no

ability to prevent it, the agency action cannot be a legally relevant

cause.  *See id.* at 770.  An impact is reasonably foreseeable if it is

34

"sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *EarthReports, Inc. v. FERC,* 828 F.3d 949, 955 (D.C. Cir. 2016) (citations omitted); *see also Sierra Club v. Marsh,* 976 F.2d 763, 767 (1st Cir. 1992).

Although NEPA requires "reasonable forecasting," an agency is not required "to engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration." *N. Plains Res. Council v. Surface Transp. Bd.,* 668 F.3d 1067, 1078-79 (9th Cir. 2011); *see also Sierra Club v. Dep't of Energy,* 867 F.3d 189, 198 (D.C. Cir. 2017) (noting that "reasonable [is] the operative word" under NEPA). This court has affirmed the Commission's "reasoned conclusion" that upstream effects on gas production were not reasonably foreseeable. *Del. Riverkeeper (Adelphia)*, 45 F.4th at 109; *Birckhead v. FERC,* 925 F.3d 510, 517 (D.C. Cir. 2019).

### 1. There is no causal link between the Commission's approval of the Project and increased natural gas production.

The Commission correctly determined that there is no causal link between natural gas production and the Project. *See* Certificate Order

P 57 (explaining that the specific source of natural gas to be transported by the Project is currently unknown and may change throughout the Project's operation), JA ____-__; Rehearing Order P 27 (same), JA ____-__.  This Court has accepted the Commission's decision not to consider upstream natural gas production when the record lacks sufficient information necessary to establish a causal relationship between the pipeline project and natural gas production.  *See Birckhead,* 925 F.3d at 516-18.

Food & Water Watch fails to address causation, and any attempt to do so on reply will be too late.  *See INEOS USA LLC v. FERC*, 940 F.3d 1326, 1329 (D.C. Cir. 2019) (observing that petitioner failed to make argument in opening brief and that "arguments made for first time in a Reply Brief are generally forfeited"); *City of Nephi, Utah v. FERC,* 147 F.3d 929, 933 n.9 (D.C. Cir. 1998) (finding forfeiture where petitioner "did not challenge the Commission's rejection of . . . argument until its reply brief").

In *Birckhead*, the Court found no support for the allegation that the project was a necessary condition for the producer/shipper to bring its natural gas to market.  925 F.3d at 517.  The same can be said here.

36

*See Cent. New York Oil & Gas Co., LLC,* 137 FERC ¶ 61,121 P 91 (2011)

(observing that Marcellus Shale development will continue in

Pennsylvania regardless of the project; if not approved, "producers or

developers of unregulated 'midstream' gathering assets will simply

build longer gathering lines to connect wells in the three-county area to

interstate pipelines, with no Commission regulation or NEPA

oversight"); Certificate Order P 57 n.122 (citing *Cent. New York* orders),

JA ____-__; Rehearing Order P 27 n.71 (same), JA ____.

To the extent causation could have been established in *Birckhead*

(which it was not), causation is even more attenuated here.  In

*Birckhead*, unlike here, the shipper was a natural gas producer.  *See*

*Birckhead*, 25 F.3d at 517.  Here, the shipper, Consolidated Edison, is a

local distribution company that can obtain natural gas supplies through

interconnections with several interstate pipelines that connect with

Tennessee Gas in its zone 4.  *See* Rehearing Order P 27 n.74, JA ____.

Here, access to these interstate pipelines permits Consolidated Edison

to contract for supplies that may be sourced anywhere in the Marcellus,

Utica, Gulf Coast, Appalachian, and Rockies supply areas.  *See id*. P 27,

JA ____-__.  Accordingly, as in *Birckhead,* Food & Water Watch has not

37

demonstrated that any particular production would not occur in the absence of the Project. *See Birckhead,* 925 F.3d at 517; *see also Del. Riverkeeper (Adelphia),* 45 F.4th at 109 (finding no evidence that production would occur only if project was approved); Certificate Order P 57 (finding lack of causation because the source of natural gas to be transported by the Project is unknown and "may change throughout the [P]roject's operation"), JA ____; Rehearing Order P 27 (same), JA ____. did not go forward).

## 2.    Any upstream production effects from the Project are not reasonably foreseeable.

Employing "common sense" and its notion of "simple cause and effect," Food & Water Watch presumes that increased upstream production is reasonably foreseeable. *See* Br. 30. However, this Court has already rejected that presumption. *See Del. Riverkeeper (Adelphia),* 45 F.4th at 109 (reviewing and affirming *Adelphia Gateway, LLC,* 169 FERC ¶ 61,220 (2019), *order on reh'g,* 171 FERC ¶ 61,049 (2020)); *see also* Certificate Order P 57 n.122 (citing analysis in *Adelphia* orders), JA ____; Rehearing Order P 27 n.71 (same), JA ____.

This Court has rejected arguments similar to Food & Water Watch's, explaining that simply pointing to the location of active,

proposed, and reported natural gas wells in Pennsylvania "do[es] not explain how that location data supports an inference that more wells will be needed to support increased demand spurred by the Project." *Del. Riverkeeper (Adelphia),* 45 F.4th at 109.  Here, Food & Water Watch provides a graph that shows declining "barrels" over time.  *See* Br. 30.  But, given the access to broad supply locations provided by the Project, none of this information provided by a declining production curve would help the Commission identify the source of the natural gas. *See* Rehearing Order P 27, JA ____-__.

As the Commission previously explained, "where there is not even an identified general supply area for the gas that will be transported on the project, any analysis of production impacts would be so generalized it would be meaningless." *Adelphia Gateway*, 169 FERC ¶ 61,220 P 243 (citing *Sierra Club v. Dep't of Energy*, 867 F.3d at 200); *see also* Certificate Order P 57 n.122 (citing *Adelphia* order), JA ____; Rehearing Order P 27 n.71 (same), JA ____.  For example, without knowing when, where, and how production development will occur, it is impossible to know "what the associated infrastructure and related facilities may be for those wells ultimately drilled." *Cent. New York Oil & Gas,* 138

FERC ¶ 61,104 P 48; *see also* Certificate Order P 57 n.122 (citing *Cent. New York* order), JA ____; Rehearing Order P 27 n.71 (same).

The specific source of natural gas to be transported by the Project is "currently unknown and may change throughout the [P]roject's operation." Rehearing Order P 27, JA ____-__. Accordingly, the Commission rejected Food & Water Watch's assertion that the natural gas for the project would come directly from the Marcellus and Utica supply areas, explaining that the assertion is "inconsistent with Tennessee's explanation of the production areas that already serve Line 300." Rehearing Order P 27, JA ____.

Nothing is known about the location and number of wells because shippers on Tennessee's Line 300 (such as Consolidated Edison) can "access diversified natural gas supplies from the Marcellus, Utica, Gulf Coast, Appalachian, and Rockies supply areas to delivery points along Tennessee's mainline system." *Id.*; *see also Tennessee Gas Pipeline Co.*, 131 FERC ¶ 61,140 P 18 (2010) (explaining, in earlier proceeding, that improvements to Tennessee Gas's 300 Line System "will help alleviate pipeline constraints . . . by increasing pipeline capacity . . . [and by] providing access to diversified natural gas supplies from the Gulf Coast,

Appalachian, Rockies, and Marcellus Shale supply areas"); *see also*
Rehearing Order P 27 n.74 (citing Tennessee Gas's earlier application
and *Tennessee Gas Pipeline,* 131 FERC ¶ 61,140 ), JA ____.  The court
in *Birckhead* similarly found that the record contained "no record
evidence that would help the Commission predict the number and
location of any additional wells that would be drilled as a result of
production demand created by the Project."  925 F.3d at 517.

Contrary to Food & Water Watch's assertions (*see* Br. 36-39), the
Commission did not have an obligation to ask for additional information
where to do so would not add meaningful new information to the record.
*See* Rehearing Order P 27 (explaining that additional information
would not be helpful when the specific source of natural gas is currently
unknown and may change and when pipeline can access diversified
natural gas supplies, across the country, from the Marcellus, Utica,
Gulf Coast, Appalachian, and Rockies supply areas), JA ____; *see
also Sierra Club v. Dep't of Energy,* 867 F.3d at 199 (agency is not
required to "foresee the unforeseeable") (quoting *Scientists' Inst. for
Pub. Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1092 (D.C.
Cir. 1973)).

Food & Water Watch assumes that Project gas will come "directly from the Marcellus and Utica supply areas" in the mid-Atlantic production region, relatively close to its members.  Rehearing Order P 27, JA ____.  But, as Tennessee Gas explained to the Commission here, Consolidated Edison's contract with Tennessee Gas provides that natural gas will first enter Tennessee Gas's interstate system at its zone 4, which is depicted in the following map:



42

*See* Rehearing Order P 27 n.74 (referring to Tennessee Gas zone 4),

JA ____.  (The web link to the above map[5] is stated in Tennessee Gas's

FERC tariff.  *See* Tennessee Gas Tariff, Sixth Revised Volume No. 1,

Sheet No. 5.)  As the map depicts, Tennessee Gas receives natural gas

in zone 4 from an expanse of pipeline spanning from Pennsylvania to

Ohio, which connects to additional interstate pipelines along the way.

Accordingly, it is simply not correct that supply for the Project will

necessarily come from the Marcellus and Utica supply regions.

The court in *Food & Water Watch*, as in *Birckhead*, expressed

concern about the Commission's determination that seeking additional

information would not be helpful.  *See Food & Water Watch*, 28 F.4th at

286 (citing *Birckhead*, 925 F.3d at 519).  Although Food & Water Watch

argues (at 36-39) that the Commission should have asked for more

information in this case, that argument is unavailing here because the

[P]roject configuration shows that asking for additional information

would not result in the information necessary to assess whether or how

the project might induce upstream environmental impacts.  *See*

---

[5] The map can be accessed at:
http://pipeline2.kindermorgan.com/default.aspx?code=TGP

Rehearing Order P 27, JA ____.  Like in *Del. Riverkeeper (Adelphia),*
Tennessee "will receive gas from other interstate pipelines."  45 F.4th at
109; *see also* Rehearing Order P 27 (describing diverse supply regions),
JA ____-__.  Natural gas production, where "every natural gas-
producing region in the country is a potential source," is not a
reasonably foreseeable indirect impact.  *Sierra Club v. Dep't of Energy,*
867 F.3d at 199; *see also* Final EIS at 28 (listing unknown factors
related to upstream production: the location of the supply source;
whether transported gas will come from new or existing production; and
whether there will be any potential associated development activities,
and if so, the location of those activities), JA ____.

Given that the configuration of Tennessee Gas's interstate
pipeline system enables the transportation of natural gas sourced from
diverse geographic regions (as far away the Gulf Coast and Rockies
supply areas), the Commission sensibly declined to ask for additional
information because doing so "would not provide meaningful
information."  Rehearing Order P 27 n.74, JA ___-__; *see also Sierra
Club v. Dep't of Energy,* 867 F.3d at 199 (explaining that production-
related effects were not reasonably foreseeable given that (1) the

44

"interconnected pipeline system" means that "every natural-gas-producing region in the country is a potential source for new gas wells;" and (2) production-related effects are local in nature); *see also Del. Riverkeeper (Adelphia),* 45 F.4th at 109 (describing Commission's reasoning that upstream production is not an indirect effect because the project will receive gas from other interstate pipelines).

**B.    The Commission's evaluation of downstream indirect ozone effects fully complied with NEPA.**

Food & Water Watch argues that the Commission failed to consider reasonably foreseeable downstream ozone air pollution.  *See* Br. 39-44.  However, the Commission's evaluation of ozone emissions associated with downstream consumption fully complied with its NEPA responsibilities because localized effects due to potential increases in ozone and other pollutants in Westchester County are too uncertain to be reasonably foreseeable.  *See* Rehearing Order PP 28-32, JA ____-__.

Ozone is formed by a combination of sunlight and ozone precursors—nitrogen oxides and various volatile organic compounds, which are released when gas is combusted.  *See* Rehearing Order 29, JA ____.  Because the combustion of natural gas releases ozone precursors, "all else equal, in [the] absence of any offsets, including

45

substitution of downstream fuel oil, an increase in natural gas combustion in the region will likely lead to some increase in ozone pollution." *Id.*

Recognizing this relationship, the Commission estimated the contribution of the Project to ozone precursors, finding that the Project would increase nitrogen oxide emissions by 0.69 to 1.62 percent and volatile organic compounds by 0.05 percent. *See* Rehearing Order P 30 n.85, JA ____. Food & Water Watch is wrong to refer to these estimates as improper "post hoc" (Br. 42) because an agency may augment its staff environmental review in its later orders. *See Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n,* 879 F.3d 1202, 1210-12 (D.C. Cir. 2018) (citing *Friends of the River v. FERC*, 720 F.2d 93, 97, 105-08 (D.C. Cir. 1983)); *Sierra Club v. Dep't of Energy,* 867 F.3d at 197.

The Commission discussed the health effects associated with increased concentrations of ozone. *See* Rehearing Order P 29 n.80 (citing *Annova LNG Common Infrastructure, LLC,* 170 FERC ¶ 61,140 (2020), JA ____; Environmental Assessment at 54-55 (explaining development of National Ambient Air Quality standards), JA ____-__), JA ____; *see also id*. n.80 (explaining that exposure to increased ozone

46

levels could "cause a number of health effects, such as decreased lung function and airway inflammation[,] respiratory symptoms including coughing, throat irrigation, chest tightness, wheezing, and shortness of breath"), JA ____; Final EIS at 54-55 (describing National Ambient Air Quality Standards that are "considered to be protective of human health and welfare, including sensitive populations such as children, the elderly, and asthmatics"), JA ____-__.

Food & Water Watch insists that the Commission do more, i.e. convert the quantified emissions of ozone precursors into quantified ozone. *See* Br. 42. But the Commission was not required to quantify ozone effects related to downstream end-use because "the localized impacts due to potential increases in ozone and other pollutants in Westchester County are too uncertain." Rehearing Order P 29, JA ____. The Commission reasonably explained why doing so would only add to speculation, resulting in numbers that would neither be helpful to the agency, nor helpful to the public. *See id.* PP 31-32, JA ____-__.

Where there are multiple emitters, quantifying ozone by translating ozone precursors to ozone would require the Commission to engage in conjecture. *See* Rehearing Order P 30 n.86, JA ____-__. Here,

47

the natural gas will be consumed by a combination of commercial, industrial, and residential users, with the different types of combustion resulting in significantly different amounts of ozone precursor emissions. *Id.*, JA ____-__.

Moreover, translating the precursors to ozone requires a second level of speculation, i.e., complex regional photochemical modeling that considers seasonal differences and atmospheric conditions, in addition to existing emissions. *See* Rehearing Order P 31, JA ____. *See id.* All this results in something "well beyond the sort of 'reasonable forecasting and speculation' that NEPA requires." *Id.* (quoting *Sierra Club v. Dep't of Energy,* 867 F.3d at 198); *see also Sierra Club v. Dep't of Energy,* 867 F.3d at 198 ("reasonable being the operative word"); *Coal. on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 66 (D.C. Cir. 1987) (explaining that the "NEPA process involves an almost endless series of judgment calls" and that the "line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts").

This Court has approved quantification of ozone precursors as a reasonable proxy for ozone impacts. *See WildEarth,* 738 F.3d at 312; *see also* Rehearing Order P 30 n.85, P 31 n.92, P 32 n.94 (citing *WildEarth*),

48

JA ____-__.  In particular, NEPA does not require an agency to

separately model a project's effects on local ozone levels when

discussion of ozone precursors otherwise addresses ozone impacts.  *See*

*WildEarth,* 738 F.3d at 312.

That conclusion is consistent with the Court's holding that

downstream greenhouse gas emissions can be reasonably foreseeable

where the end use is known.  *See Del. Riverkeeper (Adelphia),* 45 F.4th

at 110; *Food & Water Watch*, 28 F.4th at 288-89 ("[F]oreseeability

depends on information about the destination and end use of the gas in

question.") (quotation omitted); *Sierra Club (Sabal Trail),* 867 F.3d at

1374-75.  The distinction between the two is explained by the fact that

estimating ozone precursors is much more complex and speculative

than estimating greenhouse gas emissions, as the latter can be done

using straightforward arithmetic (i.e., quantity of natural gas burned

multiplied by the relevant conversation factor) whereas the former

requires layer upon layer of different assumptions.  *See* Rehearing

Order P 32, JA ____.

As in *WildEarth*, Food & Water Watch's objections "boil down to a

dispute about the adequacy of using projected emissions of ozone

precursors . . . as proxies by which to analyze the impact of future ozone levels." 738 F.3d at 311.  *WildEarth* found that the agency, by including a discussion of ozone precursors, had satisfied its NEPA obligations "given the critical role [nitrogen oxides] play[] in ozone formation." 738 F.3d at 312.  The same is true here.

In addition, estimating the increase in ozone could "potentially introduce errors" and would render uncertain results because the analysis requires two levels of conjecture.  Rehearing Order P 30, JA ____.  As noted above, the Commission would first need to speculate about how the natural gas is consumed.  *See id.; see also Del. Riverkeeper (Adelphia),* 45 F.4th at 110 (recognizing that there will "inevitably be some limits on the foreseeability of emissions").  Second, the Commission would need to speculate further about the conditions under which the precursors interact with the atmosphere.  *See* Rehearing Order P 30, JA ____.  Such calculations would be of limited use to the Commission and the public because, unlike greenhouse gas emissions, emissions of ozone precursors vary depending on how the gas is used.  *See id.*

Food & Water Watch's remaining arguments were not raised in its agency rehearing request, and thus were not preserved for judicial review.  *See* 15 U.S.C. § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); *see also supra* pp. 28-29 (cases requiring specificity of argument).

These include arguments that the Commission should have relied on a particular tool for modeling ozone (*see* Br. 42) and that the Commission erred by failing to address how the Project would be consistent with New York State's efforts to comply with the Clean Air Act (*see id.* 43).  *See Food & Water Watch,* 28 F.4th at 287 (explaining similar failure to preserve).  In any event, the Final EIS addressed conformity with the Clean Air Act, and concluded that the Project is not subject to Clean Air Act general conformity requirements.  *See* Environmental Assessment at 58-59, JA ____-__.

## C.    The Commission's discussion of the significance of greenhouse gas emissions fully complied with NEPA.

Food & Water Watch asserts that the Commission erred by failing to consider the significance of the effects related to the Project's direct

and indirect greenhouse gas emissions.  *See* Br. 44-49.  This misreads the Commission's orders.  *See* Certificate Order PP 49-62 (considering the significance of greenhouse gas emissions), JA ____-__; Rehearing Order PP 33-37 (same), JA ____-__.

Food & Water Watch's arguments conflate making a significance determination with considering significance.  NEPA requires the Commission to discuss the environmental impact of any action "significantly" affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C); *Env't Health Tr. v. FCC,* 9 F.4th 893, 900 (D.C. Cir. 2021) (explaining that agency must prepare an environmental impact statement "[i]f" the action stands to "significantly" effect the environment) (quoting 42 U.S.C. § 4332(c)); *see also* 40 C.F.R. § 1502.3 (requiring environmental impact statements for actions that "significantly" affect the environment).  Council on Environmental Quality regulations require that the environmental impact statement address the environmental consequences of the action, which includes, as relevant here, the "environmental impacts of the proposed action" and the "significance of those impacts."  40 C.F.R. § 1502.16(a)(1).

52

A significance determination, as opposed to a discussion of significance, only has relevance when determining the appropriate level of NEPA review, i.e. whether to prepare an environmental assessment or a more comprehensive environmental impact statement. *See Food & Water Watch,* 28 F.4th at 289 (explaining that "determining the 'significance' of expected environmental impacts of an action is an integral part of an environmental assessment); 40 C.F.R. § 1501.3(a)(2), (3); *see also Myersville,* 783 F.3d at 1322 (explaining that an environmental impact statement is unnecessary if an agency makes a "finding of no significant impact").

But here, the Commission issued the more comprehensive environmental impact statement; thus, there is no question about whether the Commission chose the correct NEPA procedure. *See* Certificate Order PP 33-35 (explaining that, after issuing Environmental Assessment, Commission staff issued the draft environmental impact statement and the Final EIS), JA ____-__; Notice of Intent to Prepare an Environmental Impact Statement (May 27, 2021) ("The EIS will assist the Commission in its consideration of the Project's contribution to climate change and its decision-making process

53

to determine whether Tennessee's proposed Project is in the public convenience and necessity."), R. 231, JA ____.

The Commission reasonably declined to determine significance because it could not identify a methodology for doing so. *See* Certificate Order P 67, JA ____; Rehearing Order P 34, JA ____; Final EIS at 20, JA ____. Where there is no "workable alternative method" of assessing significance of climate impacts, Food & Water Watch's argument fails. *Food & Water Watch,* 28 F.4th at 290.

In addition, there is an ongoing proceeding before the agency to determine whether and how the Commission will conduct significance determinations going forward. *See* Rehearing Order P 37 (citing *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews,* Interim Policy Statement, 178 FERC ¶ 61,108 (2022), *changed to draft status,* Order on Draft Policy Statements, 178 FERC ¶ 61,197 (2022)), JA ____-__.

In any case, the Commission thoroughly discussed the greenhouse gas emissions associated with the Tennessee Gas Project. The Commission began by quantifying the reasonably foreseeable greenhouse gas emissions associated with construction and operation of

54

the Project, including emissions associated with downstream

consumption.  *See* Certificate Order PP 50-51, 54, JA ____-__, ____;

Final EIS at 17, 25, JA ____, ____.  For the reasons discussed (*see supra*

section III.B), the Commission did not include emissions associated with

upstream production.  *See* Certificate Order P 55-57, JA ____-__; Final

EIS at 27-28 (explaining that the "specific sources of natural gas to be

transported by the Project are unknown and would likely change

throughout the Project's operational lifetime), JA ____.

The Commission did not stop with the numbers.  The Commission

compared the calculated greenhouse gas emissions to national and state

(Pennsylvania, New Jersey, and New York) emissions as a reasonable

proxy for assessing climate change effects.  *See* Certificate Order P 54,

JA ____; Rehearing Order P 35, JA ____; Final EIS at 18-19, JA ____-__.

In addition to these comparisons, the Commission compared the

Project's greenhouse gas emissions to state goals (such as the Climate

Act) to provide additional context and aid the decision-making process.

*See* Certificate Order P 54 & n.109, JA ____-__; Final EIS at 18-20,

JA ____-__.  "However, the Commission is unable to determine how

individual projects will affect international, national, or state-wide

GHG emissions reduction targets or whether a project's GHG emissions comply with those goals or laws." Certificate Order P 54, JA ____-__.

In addition to quantification and comparisons to national and state emissions, the Commission included a substantial qualitative analysis. The Commission explained that the Project would increase the atmospheric concentration of greenhouse gas emissions, in combination with past and future emissions from all other sources, and would contribute cumulatively to climate change. *See* Certificate Order P 54, JA ____.

The Final EIS provided further detail about the connection between greenhouse gas emissions and climate change using the state of the science. *See* Final EIS at 14-20 (describing extensive literature published by the United States Global Change Research Program addressing climate change, including the *Climate Science Special Report: Fourth National Climate Assessment*, Volumes I and II (2017 and 2018, respectively) (Climate Report) and subsequent reports), JA ____-__. The Final EIS explained that the Climate Report states that climate change has resulted in a wide range of impacts across every region of the country and that these changes are driven by

56

accumulation of greenhouse gas emissions in the atmosphere through

combustion of fossil fuels (including natural gas) and other sources. *See*

*id.* at 14-15, JA ____-__.  Although the Final EIS identified climate

change as a global phenomenon (and provided links to the substantial

literature describing global effects), the Final EIS focused on the

existing and potential cumulative climate change impacts in the Project

area. *See id.* at 15-16, JA ____-__.

Regional effects included current effects (related to annual

average temperatures, changes to precipitation patterns, alterations to

snowmelt runoff, and effects on ocean and coastal ecosystems) and

projected effects (related to precipitation, increasing temperatures,

alternations to the freeze-free period, sea level rise, and effects on

infrastructure). *See id.* at 15-16, JA ____-__.

However, Commission staff could not identify a methodology

to attribute discrete, quantifiable, physical effects on the

environment resulting from the Project's incremental contribution to

greenhouse gas emissions. *See* Final EIS at 17-18, JA ____-__.

"Without the ability to determine discrete resource impacts,

Commission staff are unable to assess the Project's contribution to

climate change through any objective analysis of physical impact attributable to the Project." *Id.* at 18, JA ____. The analysis also included discussion of the U.S. government's efforts to address climate change. *See id.*

But the Commission did not stop there. The Commission also disclosed the Project's total social cost of greenhouse gas emissions over the life of the 20-year contract for firm transportation service. *See* Certificate Order P 61; Rehearing Order P 37, JA ____; *see also* Certificate Order P 60 (explaining that, although it was disclosing the social cost of greenhouse gas emissions, the Commission was not "relying on or using the social cost of [greenhouse gas emissions] estimates to make any finding or determination regarding either the impact of the project's [greenhouse gas] emissions or whether the project is in the public convenience and necessity"), JA ____. Using methods and values from the most recent guidance from the Interagency Working Group on Social Cost of Greenhouse Gases, the Commission provided the social cost of greenhouse gas emissions using three different discount rates and a fourth scenario that assumed a higher economic impact scenario. Certificate Order P 61 & n.133,

JA \_\_\_\_; Rehearing Order P 37, JA \_\_\_\_.  Although the Commission was unable to determine significance from these values, the Commission had no obligation to do so.  S*ee* Rehearing Order P 37 (citing court and agency cases), JA \_\_\_\_; *see also Mountain Valley Pipeline, LLC,* 161 FERC ¶ 61,043 P 296 (2017), *order on reh'g,* 163 FERC ¶ 61,197 PP 275-297 (2018), *aff'd, Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at 2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports,* 828 F.3d at 956 (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes").

In light of the Commission's (1) quantification and discussion of the greenhouse gas emissions associated with the Tennessee Gas Project; (2) discussion of the significance of these emissions, including

comparisons to national and state emissions; and (3) extensive qualitative discussion, Food & Water Watch's challenges to the Commission analysis fail. *See WildEarth,* 738 F.3d at 302; *Sierra Club (Sabal Trail),* 867 F.3d 1357; *see also Baltimore Gas & Elec. Co.*, 462 U.S. at 97 (explaining that NEPA "require[s] only that the agency take a 'hard look' at the environmental consequences before taking a major action"). As described above, the Commission has taken that hard look, including a discussion of significance. No more is required.

## Conclusion

For the foregoing reasons the Court should deny Food & Water Watch's petitions for review.

Respectfully submitted,


Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Scott Ray Ediger*
Scott Ray Ediger
Attorney


Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8509
scott.ediger@ferc.gov

May 15, 2023

## Certificate of Compliance

In accordance with Fed. R. App. P 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P 32(a)(7)(B) because it contains 11,029 words excluding the parts of the brief exempted by Fed. R. App. P 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared using Century Schoolbook 14-point font, in Microsoft Word.

/s/ Scott Ray Ediger
Scott Ray Ediger
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
(202) 502-8509
scott.ediger@ferc.gov

May 15, 2023

# ADDENDUM
# Statutes & Regulations

# TABLE OF CONTENTS

**STATUTES**                                                                    **PAGE**

Administrative Procedure Act

    5 U.S.C. § 706 .................................................................... A1

National Environmental Policy Act

    42 U.S.C. § 4332 ................................................................ A2

Natural Gas Act

    Section 1, 15 U.S.C. § 717 ............................................... A5

    Section 7, 15 U.S.C. § 717f .............................................. A7

    Section 19, 15 U.S.C. § 717r............................................. A10

**REGULATIONS**

    18 C.F.R. § 385.713 ......................................................... A12

    40 C.F.R. § 1501.3 .......................................................... A15

    40 C.F.R. § 1502.3 .......................................................... A17

    40 C.F.R. § 1502.16 ........................................................ A18

    40 C.F.R. § 1508.1 .......................................................... A20

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of

able at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

### STATUTORY NOTES AND RELATED SUBSIDIARIES

#### COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

### EXECUTIVE DOCUMENTS

#### EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

#### EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

    (i) the environmental impact of the proposed action,

    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

    (iii) alternatives to the proposed action,

    (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

    (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

    (i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

    (ii) the responsible Federal official furnishes guidance and participates in such preparation,

    (iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

    (iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibil-

ities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, §102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

### Editorial Notes

#### Amendments

1975—Par. (2)(D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

### Statutory Notes and Related Subsidiaries

#### Certain Commercial Space Launch Activities

Pub. L. 104–88, title IV, §401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

    ''(1) the Department of the Army has issued a permit for the activity; and

    ''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

### Executive Documents

#### Ex. Ord. No. 13352. Facilitation of Cooperative Conservation

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environ-

---

[1] So in original. The period probably should be a semicolon.

ment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition.* As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities.* To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation.* The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision.* This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

## § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

## § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

## § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

## § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

### SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

## § 4341. Omitted

#### Editorial Notes

##### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

## § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and

## § 715m. Cooperation between Secretary of the Interior and Federal and State authorities

The Secretary of the Interior, in carrying out the Act of February 22, 1935, as amended (15 U.S.C., ch. 15A), is authorized to cooperate with Federal and State authorities.

(June 25, 1946, ch. 472, § 3, 60 Stat. 307.)

### Editorial Notes

#### REFERENCES IN TEXT

Act of February 22, 1935, referred to in text, is act Feb. 22, 1935, ch. 18, 49 Stat. 30, popularly known as the ''Hot Oil Act'' and also as the ''Connally Hot Oil Act'', which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 715 of this title and Tables.

#### CODIFICATION

Section was not enacted as a part of act Feb. 22, 1935, which comprises this chapter.

### Executive Documents

#### DELEGATION OF FUNCTIONS

Delegation of President's authority to Secretary of the Interior, see note set out under section 715j of this title.

## CHAPTER 15B—NATURAL GAS

Sec.
717.      Regulation of natural gas companies.
717a.     Definitions.
717b.     Exportation or importation of natural gas; LNG terminals.
717b–1.   State and local safety considerations.
717c.     Rates and charges.
717c–1.   Prohibition on market manipulation.
717d.     Fixing rates and charges; determination of cost of production or transportation.
717e.     Ascertainment of cost of property.
717f.     Construction, extension, or abandonment of facilities.
717g.     Accounts; records; memoranda.
717h.     Rates of depreciation.
717i.     Periodic and special reports.
717j.     State compacts for conservation, transportation, etc., of natural gas.
717k.     Officials dealing in securities.
717l.     Complaints.
717m.     Investigations by Commission.
717n.     Process coordination; hearings; rules of procedure.
717o.     Administrative powers of Commission; rules, regulations, and orders.
717p.     Joint boards.
717q.     Appointment of officers and employees.
717r.     Rehearing and review.
717s.     Enforcement of chapter.
717t.     General penalties.
717t–1.   Civil penalty authority.
717t–2.   Natural gas market transparency rules.
717u.     Jurisdiction of offenses; enforcement of liabilities and duties.
717v.     Separability.
717w.     Short title.
717x.     Conserved natural gas.
717y.     Voluntary conversion of natural gas users to heavy fuel oil.
717z.     Emergency conversion of utilities and other facilities.

## § 717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

### (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

### (d) Vehicular natural gas jurisdiction

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

(1) not otherwise a natural-gas company; or
(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, § 1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, § 404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, § 311(a), Aug. 8, 2005, 119 Stat. 685.)

## Editorial Notes

### AMENDMENTS

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).

1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

## Statutory Notes and Related Subsidiaries

### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

### STATE LAWS AND REGULATIONS

Pub. L. 102–486, title IV, §404(b), Oct. 24, 1992, 106 Stat. 2879, provided that: "The transportation or sale of natural gas by any person who is not otherwise a public utility, within the meaning of State law—

"(1) in closed containers; or

"(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

### EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

## Executive Documents

### EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

### PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

### PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

## § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

(June 21, 1938, ch. 556, §2, 52 Stat. 821; Pub. L. 102–486, title IV, §404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(b), Aug. 8, 2005, 119 Stat. 685.)

## Editorial Notes

### AMENDMENTS

2005—Par. (11). Pub. L. 109–58 added par. (11).

1992—Par. (10). Pub. L. 102–486 added par. (10).

## Statutory Notes and Related Subsidiaries

### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for cer-

section shall be construed to create a private right of action.

(June 21, 1938, ch. 556, §4A, as added Pub. L. 109–58, title III, §315, Aug. 8, 2005, 119 Stat. 691.)

## § 717d. Fixing rates and charges; determination of cost of production or transportation

### (a) Decreases in rates

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however*, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

### (b) Costs of production and transportation

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, §5, 52 Stat. 823.)

## § 717e. Ascertainment of cost of property

### (a) Cost of property

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

### (b) Inventory of property; statements of costs

Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, §6, 52 Stat. 824.)

## § 717f. Construction, extension, or abandonment of facilities

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however*, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which such authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, §7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, §608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, §2, Oct. 6, 1988, 102 Stat. 2302.)

### Editorial Notes

#### Amendments

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, §608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, §608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1988 Amendment

Pub. L. 100–474, §3, Oct. 6, 1988, 102 Stat. 2302, provided that: "The provisions of this Act [amending this sec-

tion and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988].''

#### Executive Documents

##### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(d), 203(a), 14 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

### § 717g. Accounts; records; memoranda

#### (a) Rules and regulations for keeping and preserving accounts, records, etc.

Every natural-gas company shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this chapter: *Provided, however*, That nothing in this chapter shall relieve any such natural-gas company from keeping any accounts, memoranda, or records which such natural-gas company may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by such natural-gas companies, and may classify such natural-gas companies and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays or receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof.

#### (b) Access to and inspection of accounts and records

The Commission shall at all times have access to and the right to inspect and examine all accounts, records, and memoranda of natural-gas companies; and it shall be the duty of such natural-gas companies to furnish to the Commission, within such reasonable time as the Commission may order, any information with respect thereto which the Commission may by order require, including copies of maps, contracts, reports of engineers, and other data, records, and papers, and to grant to all agents of the Commission free access to its property and its accounts, records, and memoranda when requested so to do. No member, officer, or employee of the Commission shall divulge any fact or information which may come to his knowledge during the course of examination of books, records, data, or accounts, except insofar as he may be directed by the Commission or by a court.

#### (c) Books, accounts, etc., of the person controlling gas company subject to examination

The books, accounts, memoranda, and records of any person who controls directly or indirectly a natural-gas company subject to the jurisdiction of the Commission and of any other company controlled by such person, insofar as they relate to transactions with or the business of such natural-gas company, shall be subject to examination on the order of the Commission.

(June 21, 1938, ch. 556, §8, 52 Stat. 825.)

### § 717h. Rates of depreciation

#### (a) Depreciation and amortization

The Commission may, after hearing, require natural-gas companies to carry proper and adequate depreciation and amortization accounts in accordance with such rules, regulations, and forms of account as the Commission may prescribe. The Commission may from time to time ascertain and determine, and by order fix, the proper and adequate rates of depreciation and amortization of the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas. Each natural-gas company shall conform its depreciation and amortization accounts to the rates so ascertained, determined, and fixed. No natural-gas company subject to the jurisdiction of the Commission shall charge to operating expenses any depreciation or amortization charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation or amortization other than that prescribed therefor by the Commission. No such natural-gas company shall in any case include in any form under its operating or other expenses any depreciation, amortization, or other charge or expenditure included elsewhere as a depreciation or amortization charge or otherwise under its operating or other expenses. Nothing in this section shall limit the power of a State commission to determine in the exercise of its jurisdiction, with respect to any natural-gas company, the percentage rates of depreciation or amortization to be allowed, as to any class of property of such natural-gas company, or the composite depreciation or amortization rate, for the purpose of determining rates or charges.

#### (b) Rules

The Commission, before prescribing any rules or requirements as to accounts, records, or memoranda, or as to depreciation or amortization rates, shall notify each State commission having jurisdiction with respect to any natural-gas company involved and shall give reasonable

Statutory Notes and Related Subsidiaries

REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, § 8, 80 Stat. 632, 655.

## § 717r. Rehearing and review

### (a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were

reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

### (c) Stay of Commission order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

### (d) Judicial review

#### (1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as ''permit'') required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

#### (2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

#### (3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construc-

tion, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, § 19, 52 Stat. 831; June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

### Editorial Notes

#### REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

#### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).
1958—Subsec. (a). Pub. L. 85–791, § 19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.
Subsec. (b). Pub. L. 85–791, § 19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### Statutory Notes and Related Subsidiaries

##### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

## § 717s. Enforcement of chapter

### (a) Action in district court for injunction

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.

### (b) Mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

### (c) Employment of attorneys by Commission

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interest in investigations made by it, or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

### (d) Violation of market manipulation provisions

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 717c–1 of this title (including related rules and regulations) from—

(1) acting as an officer or director of a natural gas company; or
(2) engaging in the business of—
(A) the purchasing or selling of natural gas; or
(B) the purchasing or selling of transmission services subject to the jurisdiction of the Commission.

(June 21, 1938, ch. 556, § 20, 52 Stat. 832; June 25, 1948, ch. 646, § 1, 62 Stat. 875, 895; Pub. L. 109–58, title III, § 318, Aug. 8, 2005, 119 Stat. 693.)

### Editorial Notes

#### CODIFICATION

The words "the District Court of the United States for the District of Columbia" in subsec. (a) following "district court of the United States" and in subsec. (b) following "district courts of the United States" omitted as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United

Code of Federal Regulations
  Title 18. Conservation of Power and Water Resources
    Chapter I. Federal Energy Regulatory Commission, Department of Energy
      Subchapter X. Procedural Rules
        Part 385. Rules of Practice and Procedure (Refs & Annos)
          Subpart G. Decisions

18 C.F.R. § 385.713

§ 385.713 Request for rehearing (Rule 713).

Effective: March 23, 2006
Currentness

(a) Applicability.

(1) This section applies to any request for rehearing of a final Commission decision or other final order, if rehearing is provided for by statute, rule, or order.

(2) For the purposes of rehearing under this section, a final decision in any proceeding set for hearing under subpart E of this part includes any Commission decision:

(i) On exceptions taken by participants to an initial decision;

(ii) When the Commission presides at the reception of the evidence;

(iii) If the initial decision procedure has been waived by consent of the participants in accordance with Rule 710;

(iv) On review of an initial decision without exceptions under Rule 712; and

(v) On any other action designated as a final decision by the Commission for purposes of rehearing.

(3) For the purposes of rehearing under this section, any initial decision under Rule 709 is a final Commission decision after the time provided for Commission review under Rule 712, if there are no exceptions filed to the decision and no review of the decision is initiated under Rule 712.

(b) Time for filing; who may file. A request for rehearing by a party must be filed not later than 30 days after issuance of any final decision or other final order in a proceeding.

(c) Content of request. Any request for rehearing must:

A-12

(1) State concisely the alleged error in the final decision or final order;

(2) Conform to the requirements in Rule 203(a), which are applicable to pleadings, and, in addition, include a separate section entitled "Statement of Issues," listing each issue in a separately enumerated paragraph that includes representative Commission and court precedent on which the party is relying; any issue not so listed will be deemed waived; and

(3) Set forth the matters relied upon by the party requesting rehearing, if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order.

(d) Answers.

(1) The Commission will not permit answers to requests for rehearing.

(2) The Commission may afford parties an opportunity to file briefs or present oral argument on one or more issues presented by a request for rehearing.

(e) Request is not a stay. Unless otherwise ordered by the Commission, the filing of a request for rehearing does not stay the Commission decision or order.

(f) Commission action on rehearing. Unless the Commission acts upon a request for rehearing within 30 days after the request is filed, the request is denied.

**Credits**

[49 FR 21316, May 21, 1984; 60 FR 4860, Jan. 25, 1995; 60 FR 16567, March 31, 1995; Order 663, 70 FR 55725, Sept. 23, 2005; 71 FR 14642, March 23, 2006]

SOURCE: Order 225, 47 FR 19022, May 3, 1982; 52 FR 28467, July 30, 1987; 52 FR 35909, Sept. 24, 1987; 53 FR 15032, April 27, 1988; 53 FR 16408, May 9, 1988; 53 FR 32039, Aug. 23, 1988; 55 FR 50682, Dec. 10, 1990; 57 FR 21734, May 22, 1992; 58 FR 7987, Feb. 11, 1993; 58 FR 38528, July 19, 1993; 59 FR 63247, Dec. 8, 1994; Order 639, 65 FR 20371, April 17, 2000; Order 620, 65 FR 81344, Dec. 26, 2000; Order 692, 67 FR 52412, Aug. 12, 2002; Order 685, 71 FR 65051, Nov. 7, 2006; 72 FR 11287, March 13, 2007; Order 756, 77 FR 4895, Feb. 1, 2012; Order 826, 81 FR 43941, July 6, 2016; Order 834, 82 FR 8139, Jan. 24, 2017; Order 854, 84 FR 3983, Feb. 14, 2019; Order 865, 85 FR 2018, Jan. 14, 2020, unless otherwise noted.

AUTHORITY: 5 U.S.C. 551–557; 15 U.S.C. 717–717w, 3301–3432; 16 U.S.C. 791a–825v, 2601–2645; 28 U.S.C. 2461; 31 U.S.C 3701, 9701; 42 U.S.C. 7101–7352, 16441, 16451–16463; 49 U.S.C. 60502; 49 App. U.S.C. 1–85 (1988); 28 U.S.C. 2461 note (1990); 28 U.S.C. 2461 note (2015).

Notes of Decisions (90)

Current through May 11, 2023, 88 FR 30632. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Code of Federal Regulations |
| Title 40. Protection of Environment |
|    Chapter V. Council on Environmental Quality |
|       Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos) |
|          Part 1501. NEPA and Agency Planning (Refs & Annos) |

40 C.F.R. § 1501.3

§ 1501.3 Determine the appropriate level of NEPA review.

Effective: September 14, 2020

Currentness

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with § 1501.9(e)(1).

(1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43359, July 16, 2020, unless otherwise noted.


AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.


Notes of Decisions (2)

Current through May 11, 2023, 88 FR 30632. Some sections may be more current. See credits for details.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter V. Council on Environmental Quality
         Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
         Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.3

§ 1502.3 Statutory requirements for statements.

Effective: September 14, 2020
Currentness

As required by section 102(2)(C) of NEPA, environmental impact statements are to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (10)

Current through May 11, 2023, 88 FR 30632. Some sections may be more current. See credits for details.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
      Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.16

§ 1502.16 Environmental consequences.

Effective: September 14, 2020
Currentness

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

A18

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (1273)

Current through May 11, 2023, 88 FR 30632. Some sections may be more current. See credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
        Part 1508. Definitions (Refs & Annos)

---

40 C.F.R. § 1508.1

§ 1508.1 Definitions.

Effective: May 20, 2022
Currentness

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) Act or NEPA means the National Environmental Policy Act, as amended (42 U.S.C. 4321, et seq.).

(b) Affecting means will or may have an effect on.

(c) Authorization means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(d) Categorical exclusion means a category of actions that the agency has determined, in its agency NEPA procedures (§ 1507.3 of this chapter), normally do not have a significant effect on the human environment.

(e) Cooperating agency means any Federal agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action that may significantly affect the quality of the human environment.

(f) Council means the Council on Environmental Quality established by title II of the Act.

(g) Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes

---

in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

(h) Environmental assessment means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.

(i) Environmental document means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

(j) Environmental impact statement means a detailed written statement as required by section 102(2)(C) of NEPA.

(k) Federal agency means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(l) Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise categorically excluded (§ 1501.4 of this chapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(m) Human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (See also the definition of "effects" in paragraph (g) of this section.)

(n) Jurisdiction by law means agency authority to approve, veto, or finance all or part of the proposal.

(o) Lead agency means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the environmental impact statement.

(p) Legislation means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(q) Major Federal action or action means an activity or decision subject to Federal control and responsibility subject to the following:

(1) Major Federal action does not include the following activities or decisions:

(i) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

(ii) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority;

(iii) Activities or decisions that do not result in final agency action under the Administrative Procedure Act or other statute that also includes a finality requirement;

(iv) Judicial or administrative civil or criminal enforcement actions;

(v) Funding assistance solely in the form of general revenue sharing funds with no Federal agency control over the subsequent use of such funds;

(vi) Non–Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project; and

(vii) Loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance (for example, action does not include farm ownership and operating loan guarantees by the Farm Service Agency pursuant to 7 U.S.C. 1925 and 1941 through 1949 and business loan guarantees by the Small Business Administration pursuant to 15 U.S.C. 636(a), 636(m), and 695 through 697g).

(2) Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8 of this chapter).

(3) Major Federal actions tend to fall within one of the following categories:

(i) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 et seq. or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

A22

(iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

(r) Matter includes for purposes of part 1504 of this chapter:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(s) Mitigation means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(t) NEPA process means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(u) Notice of intent means a public notice that an agency will prepare and consider an environmental impact statement.

(v) Page means 500 words and does not include explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(w) Participating agency means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

A23

USCA Case #22-1214    Document #1999243    Filed: 05/15/2023    Page 101 of 103

(x) Proposal means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(y) Publish and publication mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this chapter.

(z) Reasonable alternatives means a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action.

(aa) Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(bb) Referring agency means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(cc) Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§ 1501.11 of this chapter).

(dd) Senior agency official means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

(ee) Special expertise means statutory responsibility, agency mission, or related program experience.

(ff) Tiering refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

**Credits**

[85 FR 43378, July 16, 2020, as amended at 87 FR 23469, Apr. 20, 2022]

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43374, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (2)

A24

Current through May 11, 2023, 88 FR 30632. Some sections may be more current. See credits for details.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

## Certificate of Service

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on May 15, 2023. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Scott Ray Ediger*
Scott Ray Ediger
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8509
scott.ediger@ferc.gov

May 15, 2023